IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. CCB-07-0301 |
| | : | |
| KELVIN DEMAR SPENCER, ET AL. | : | |

...o0o...

**MEMORANDUM**

Kelvin Demar Spencer, Shawn Scott, and Marquis Hailstock have been indicted by a grand jury in the District of Maryland on charges of conspiracy to distribute and possess with intent to distribute cocaine and marijuana (Count One); and possession with intent to distribute cocaine and marijuana (Count Two).  Mr. Spencer is charged separately with being a felon in possession of a MAC 10 firearm (Count Three); Mr. Scott is charged with unlawful possession of a High Point handgun (Count Four).  All offenses allegedly occurred on June 26, 2007.[1]

The charges arose out of a police stop of two vehicles on I-95, during which the MAC-10, as well as a quantity of cocaine and marijuana, ammunition, and related items, were recovered from the vehicle driven by Mr. Spencer.  Mr. Spencer filed a motion to suppress that evidence.  An evidentiary hearing was held January 18, 2008, followed by supplementary briefing and oral argument April 18, 2008.  After consideration, for the reasons stated below, I will deny the motion to suppress.

I find the relevant facts, based on the testimony and exhibits, to be as follows.

On June 26, 2007, shortly before 7:30 a.m., Sergeant Daniel Fairburn of the Maryland State Police ("MSP") observed two vehicles just ahead of him on I-95 in Cecil County, Maryland, traveling at approximately 80 mph in a 65-mph zone.  The lead vehicle, a 2007 Chevy Impala,

---

[1] Mr. Scott has pled guilty and been sentenced in this case.

was followed closely by a 2007 Buick Lacrosse.  Both were driving "very aggressively," very close to each other with the lead vehicle also coming up very close to the bumpers of the cars in front of it in the fast lane. (Tr. 1/18/08 at 7-8.)  Because the vehicles had tinted windows, Sgt. Fairburn could not see who was inside them, and called his partner TFC Howard Kennard to assist in the stop.  Sgt. Fairburn was able to pull the lead vehicle over on the left shoulder; TFC Kennard pulled the trail vehicle over on the right shoulder.

The sequence of events from 7:27 a.m. when the cars were pulled over until 7:53 a.m. when a drug-detecting dog alerted on the Chevy Impala is critical to the analysis in this case. MSP cars are equipped with video cameras to record stops, and the troopers have individual microphones to record the conversations.  The government introduced the audio and visual recordings made by both Sgt. Fairburn and TFC Kennard.  (GX 1 and 2.)

Sgt. Fairburn's video began at 7:27 a.m.  He approached the driver's side door and requested the driver to roll down the window; the driver, who was alone in the car, identified himself as Kelvin Spencer and provided a Georgia driver's license.  Sgt. Fairburn explained the reason for the stop: "speeding, following too closely, and driving aggressively." (Tr. at 13.)  Mr. Spencer provided a rental contract for the registration, which Sgt. Fairburn observed to be partially handwritten and incomplete.  The due date was the next day, although Mr. Spencer said he always called to extend it.  Mr. Spencer acknowledged that he was traveling with his cousins who were in the other vehicle; that they were en route to see New York City; and that they were traveling in two separate vehicles because the people in the other vehicle smoked, and he did not.[2]

---

[2] There was some confusion about whether Mr. Spencer was traveling with his cousins, or going to see a cousin, or both.

Sgt. Fairburn found that explanation "unusual," because it required renting an additional vehicle for "a couple of hundred dollars." (Tr. at 21.) He also observed two air fresheners in the Chevy, a strong odor of air freshener, and a can of Red Bull energy drink.[3]

At this point, Sgt. Fairburn returned to his car and asked Trooper Gussoni, who had arrived, to speak with Mr. Spencer while he began to call in the traffic stop. Sgt. Fairburn asked the police communications officer to run a driver's license check and a warrant check on the driver. He also made a request for a drug dog. As Sgt. Fairburn explained, he believed he already had various "criminal indicators" present, specifically travel on I-95 between two source cities under the following circumstances:

> The first thing was the vehicle was a rental vehicle and the contract was handwritten. It was not complete.
> He acknowledged that the vehicle that was traveling behind him was with him, but yet they were in separate vehicles, which is not cost-effective.
> . . .
> He had rented the vehicle in Atlanta, Georgia and, according to the rental contract, it was due back the following day in Atlanta, Georgia.
> There was also a strong odor of air freshener that was coming from within the vehicle, and there were two pine tree air fresheners that were observed, as well as an energy drink can in the center console.

(Tr. at 24-25.) Trooper Gussoni shortly thereafter reported to Sgt. Fairburn that Mr. Spencer was "extremely nervous," which heightened Sgt. Fairburn's suspicion (Tr. at 29.)[4] Significantly, at approximately 7:33 a.m., Trooper Kennard advised Sgt. Fairburn that "he would be completing a

---

[3] Sgt. Fairburn explained that air fresheners can be used to mask the odor of narcotics, and that the energy drink suggested a need to drive without stopping. (Tr. at 26-27.)

[4] Trooper Gussoni also reported that Mr. Spencer had taken out an attorney's card and "began acting like he was going to dial his attorney when he was being asked routine questions." (Tr. at 29.) That may be "unusual," but will not be counted as a factor justifying an extended stop.

probable cause search of [the trail] vehicle based on the odor of marijuana coming from within." (Tr. at 31.) Sgt. Fairburn continued his efforts to locate a drug dog and, at 7:36 a.m., reached TFC McCurdy, who advised she could arrive with her canine in approximately ten minutes.

There is a period of time, from approximately 7:36 a.m. to 7:42 a.m., when Sgt. Fairburn was in his vehicle and Mr. Spencer was in the Chevy Impala without any apparent interaction. At 7:42 a.m., TFC Kennard advised Sgt. Fairburn that he had found two loaded handguns in the trail vehicle. After obtaining backup, Sgt. Fairburn approached the Chevy and ordered Mr. Spencer out of the car. Believing that Mr. Spencer, who then reached toward an area in the middle of his legs, "was going for a gun," he pulled Mr. Spencer out of the car and handcuffed him for safety. (Tr. at 36.) Sgt. Fairburn then began completing additional paperwork required as a result of the detention. Trooper McCurdy arrived with a drug dog at 7:52 a.m. and the dog alerted to the vehicle by 7:53 a.m. During the search of the car, Sgt. Fairburn first recovered a weapon, the MAC-10, "[d]irectly underneath the driver's seat" (Tr. at 40) and then found a duffel bag or backpack in the trunk that contained a sealed bag of marijuana and a heat-sealed compressed brick of cocaine, as well as a digital scale, ammunition, and U.S. currency. (Tr. at 46-47.)

In support of the motion to suppress, Mr. Spencer argues that Sgt. Fairburn prolonged the stop beyond what was required for purposes of checking the records and completing the paperwork, pointing particularly to the time period between 7:36 a.m. and 7:42 a.m. when it did not appear that any action was being taken to complete the stop. Sgt. Fairburn indeed conceded that even before 7:36 a.m. he had decided to wait for a drug dog because of the "criminal indicators" that had accumulated. (Tr. at 85-86.)

Looked at objectively, as the law requires, the circumstances support the detention of

4

approximately 26 minutes that ultimately occurred before the dog's alert.  As the Fourth Circuit recently held in a similar case, during the detention "the police formed a reasonable suspicion of ongoing criminal activity that justified extension of the traffic stop."  *U.S. v. Branch*, 537 F.3d 328, 332 (4th Cir. 2008) (internal citations omitted).

> Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. . . . Thus, pursuant to such a stop, a police officer may request a driver's license and vehicle registration, run a computer check, and issue a citation.  A canine sniff is also constitutionally acceptable if performed within the time reasonably required to issue a traffic citation. . . . this is because a dog sniff is not a search within the meaning of the Fourth Amendment, and it therefore requires no additional justification. . . .
>
> If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place. . . . Thus, a prolonged automobile stop requires either the driver's consent or a reasonable suspicion that illegal activity is afoot.

537 F.3d at 335-36 (internal citations omitted).  Further, courts must look at the "cumulative information available," and "a police officer's decision to stop and detain an individual must be evaluated objectively."  *Id.* at 337.

In this case, within 6 minutes of stopping Mr. Spencer, Sgt. Fairburn knew not only about the air fresheners, the nervousness, and the dubious explanation for the rental of two vehicles to travel overnight between Atlanta and New York (two well-known source cities), but also that the odor of marijuana had been detected in the second car containing Mr. Spencer's traveling companions.  This was sufficient to justify an extension of the stop.  Further, within 15 minutes of the initial stop, he also knew that two loaded handguns had been found in the second vehicle.  The

associations of firearms and narcotics has been observed with some frequency by the Fourth Circuit.  *See, e.g.*, *U.S. v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999) ("Guns are . . . commonly recognized articles of narcotics paraphernalia.").  Considering that some portion of the time also was used for the ordinary purpose of records checks and writing the ticket (GX 5) and the required detention log (GX 4), the 26-minute total time between the stop and the dog's positive alert, which provided probable cause to search the car, did not violate the Fourth Amendment.

   A separate Order follows.


  <u>  September 18, 2008  </u>           <u>      /s/      </u>
      Date                       Catherine C. Blake
                              United States District Judge